IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

TERRY MATTHEW HELVEY,

      Petitioner,

v.

      Case No. 3:25-cv-00837-NJR

SUSAN RUDOLPH, WARDEN OF FCI
GREENVILLE,

      Respondent.

## MEMORANDUM AND ORDER

**ROSENSTENGEL, District Judge:**

Petitioner Terry Matthew Helvey filed a Petition for Writ of Habeas Corpus under 28 U.S.C. § 2241 challenging the denial of his request for parole. (Doc. 1). For the reasons explained below, the petition is denied.

### BACKGROUND

In 1993, Helvey, who was an active-duty member of the United States Navy, was convicted by a general court-martial under the Uniform Code Military Justice (UCMJ) for the murder of U.S. Navy Sailor Allen Schindler Jr. (Doc. 20-2). The details of Helvey's crime merit repetition here in light of the issues raised in his petition.[1]

On October 27, 1992, while on shore in Sasebo, Japan, Helvey and another sailor cornered Schindler in a public restroom and brutally assaulted him, without provocation. Evidence in the record demonstrated that Helvey knew Schindler was gay and disliked

---

[1] The facts recited here are derived from the opinion of the U.S. Navy-Marine Corps Court of Criminal Appeals' decision in Helvey's case. (Doc. 20-3). That court's summation was based on a 13-page factual stipulation signed by Helvey.

him for that reason. During the course of the beating, Helvey repeatedly stomped on Schindler's head, upper body, chest, abdomen, and groin. Helvey then "stepped down hard" on Schindler's throat for several seconds.

When confronted by two shore patrolmen, Helvey and his accomplice avoided apprehension by assaulting the officers and fleeing to their ship. Schindler later succumbed to his injuries. The forensic pathologist who examined his body stated that the injuries were the worst he had ever seen from a beating, likening the trauma to the result of a high-speed auto accident.

At least partially in an effort to avoid the possibility of the death penalty, Helvey pleaded guilty to unpremeditated murder, assaulting the Navy patrolmen, and making false statements under oath to investigators. (*Id.*). He was sentenced to a term of life in prison and dishonorably discharged. In 1995, his sentence was affirmed by the U.S. Navy-Marine Corps Court of Criminal Appeals. (Docs. 20-2, 20-3).

Helvey initially served his sentence at the U.S. Disciplinary Barracks at Fort Leavenworth in Kansas. (Doc. 1, p. 15). In February 2003, he was transferred to the custody of the Bureau of Prisons (BOP) pursuant to an agreement between the BOP and the military. *See* 10 U.S.C. § 858(a) (authorizing the confinement of military prisoners "in any penal or correctional institution under the control of the United States, or which the United States may be allowed to use"). Since September 2008, he has resided at FCI Greenville in this district. (Doc. 1, p. 16).

In 2021, Helvey was evaluated by a United States Parole Commission ("Commission") hearing examiner to assess whether he should be granted so-called

"mandatory" parole under 18 U.S.C. § 4206(d). (Doc. 1-3, p. 3). That statute permits certain eligible prisoners to be paroled "after serving thirty years of each consecutive term or terms of more than forty-five years including any life term" unless the Commission determines the prisoner "has seriously or frequently violated institution rules and regulations or that there is a reasonable probability that he will commit any Federal, State, or local crime." 18 U.S.C. § 4206(d). The examiner who evaluated Helvey recommended that he be paroled effective October 16, 2022. (Doc. 1-3, p. 3).

On March 7, 2022, the Commission denied Helvey parole. (*Id.* at pp. 26-27). The Commission stated that it had considered Helvey's "outstanding institutional adjustment . . . high level supervisory work assignments, and [] lack of disciplinary infractions," but found the "highly aggravated nature" of his offense, "lack of remorse" and evidence that his actions were motivated by homophobia, "outweigh the good" in his case. (*Id.*). Based on those factors, the Commission found a "reasonable probability" that Petitioner would "commit a future crime if released," and therefore determined that he was not eligible for parole under § 4206(d). (*Id.* at pp. 26-27). Helvey appealed the Commission's decision to the National Appeals Board, but the Board denied his appeal. (Doc. 1-3, pp. 52-53).

A little more than a month after the Commission denied his request for parole, an official from the Department of Defense's Directorate of Inmate Administration notified Helvey that pursuant to a February 22, 2022 Memorandum Agreement between the Department of the Army and the BOP, the Navy's Clemency and Parole Board (NC&PB)

would assume authority over his parole review.[2] Under Navy Policy, the NC&PB

considers multiple factors in deciding whether to grant parole:

> a. Nature and circumstances surrounding the offense(s).
> b. The approved sentence . . . in relationship to the maximum imposable sentence and the sentences of other offenders imposed as a result of their commission of similar offenses under similar circumstances.
> c. Mitigating, extenuating, and aggravating circumstances, pre-trial and post-trial matters, including the current situation and events that have occurred since any previous hearing.
> d. Risk to public safety.
> e. Confinement record (i.e., attitude, performance, acceptance of status while in confinement, and motivation).
> f. Psychological profile, including age, education, marital, and family status.
> g. Need for special counseling/therapy programs not offered by the MCF.
> h. Prior military and civilian history.
> i. Future plans and relevant conditions in the community in which the offender desires to reside on parole.
> j. Impact of the offense upon the victim.
> k. Good order and discipline within the Service.
> l. Offender's current status with law enforcement authorities, such as the presence of a detainer on an offender. The status of the offender as a foreign national does not automatically preclude parole.
> m. Other matters as appropriate.

SECNAV M-5815.1 pp. 53-54 (eff. March 2, 2020).[3]

---

[2] Despite his nominal life sentence, there is no dispute that Helvey is eligible for parole consideration. Navy regulations provide that inmates serving a sentence of "30 years or more, up to and including life," may be considered for parole after they have served "at least 10 years of confinement." *See* SECNAV M-5815.1 p. 48 (eff. March 2, 2020). Likewise, an eligible federal prisoner may be considered for parole "after serving ten years of a life sentence." 18 U.S.C. § 4205(a). And under § 4206(d), a prisoner is eligible for "mandatory" parole after serving 30 years of a life term. 18 U.S.C. § 4206(d); 28 C.F.R. § 2.53(a).

[3] The Government also directs the Court to a document titled "Guidance for DoD Prisoners confined in the Federal Bureau of Prisons," dated June 1, 2022, which advises prisoners that military parole boards consider good conduct in prison, participation in treatment programming, the ends of justice, parole planning, remorse, and family support. (Doc. 20-7, p. 36). The document emphasizes that "there is no right to Parole." (*Id.* at p. 9).

Page 4 of 29

On October 5, 2022, the NC&PB denied Helvey parole, opining that release "would depreciate the seriousness of your offenses, promote disrespect for the law and that the retributive and deterrent portion of the sentence to confinement has not yet been served." (Doc. 1-3, p. 56). Helvey's 2023 and 2024 requests were denied for substantially similar reasons. (*Id.* at pp. 59, 63). On February 11, 2025, Helvey appealed the 2024 denial to the Director of the Secretary of the Navy Council of Review Boards, arguing that his case should be reviewed under the criteria set out in § 4206(d). (*Id.* at p. 68).[4] On May 1, 2025, Helvey's appeal was denied. (Doc. 10, p. 6).

Helvey filed the present petition under 28 U.S.C. § 2241 on May 1, 2025, naming the Secretary of the Navy as the respondent. The Court later substituted the Warden of FCI Greenville, now Susan Rudolph, as the proper respondent. (Doc. 14).[5] In his petition, Helvey alleges he has been unlawfully denied mandatory parole under 18 U.S.C. § 4206(d).[6] He also claims that the Government has violated his due process rights by depriving him of parole, violated his right to equal protection by releasing similarly situated offenders, and violated his Eighth Amendment right to be free from cruel and unusual punishment. The Court screened the petition and directed the Warden of FCI Greenville, his physical custodian, to file a response. (Doc. 14).

Respondent argues that § 4206(d) does not apply to Helvey's case and, even if it did, the Government adequately justified its denial of parole. (Doc. 20). Respondent also

---

[4] Navy policy provides that offenders denied parole by the NC&PB may appeal to the Director of the Secretary of the Navy Council of Review Boards (SECNAVCORB). SECNAV M-5815.1 at pp. 55-56. There is no further right to appeal.

[5] In this order, the Court will refer to the Warden interchangeably as "Respondent" or "the Government."

[6] On May 30, 2025, Helvey filed a request for parole for the 2025 cycle. (Doc. 13-1).

argues Helvey's constitutional claims are meritless. On February 27, 2026, the Court directed the parties to file supplemental briefs addressing whether the Navy's apparent shift from considering Helvey for parole under § 4206(d) to its own criteria raised due process concerns.[7] (Doc. 29). The matter now is fully briefed and ripe for a decision.

## DISCUSSION

To begin, the Court sets out the issues it understands are presented by Helvey's petition. First, Helvey contends that decisions about his parole should be made by the Parole Commission and not the Navy because he is in BOP custody. Second, even if the decision-making authority properly was transferred to the Navy, he argues that the criteria set out in § 4206(d) remain binding, and the Navy's decision to the contrary is subject to judicial review as arbitrary and capricious. He emphasizes that if he were considered under the § 4206(d) criteria, he likely would be entitled to release because he has a clean disciplinary record in prison, and there has been no finding that he will commit another crime. Third, Helvey says his claim has constitutional dimensions: because § 4206(d) creates a liberty interest, the Navy is violating his due process rights by denying parole. He also claims that his equal protection rights were violated because he is being treated differently from other military offenders in BOP custody and that the Navy is violating his Eighth Amendment right to be free from cruel and unusual punishment.

---

[7] Respondent's supplemental brief also addressed whether the change violated the Constitution's *Ex Post Facto* clause. Helvey only raised that issue for the first time in his reply brief. The Court therefore will not consider the issue here. *See Farmer v. United States*, No. 11-40073, 2015 WL 588569, at *1 n.1 (S.D. Ill. Feb. 11, 2015); *cf. Williams v. Dieball*, 724 F.3d 957, 963 (7th Cir. 2013) ("It is not the district court's job to flesh out every single argument not clearly made.").

Respondent does not argue this Court lacks jurisdiction to consider any of these issues or that Helvey has not properly exhausted his administrative remedies. Instead, Respondent focuses on the merits, arguing that parole authority properly was transferred with the Navy in light of the impending shuttering of the Commission.[8] According to Respondent, when Helvey was sent to the BOP, nothing about his transfer suggested military authorities lost jurisdiction over him or that the transfer could not be undone. Respondent further argues that neither the Navy's parole procedures nor § 4206(d) create a liberty interest for due process rights to attach. In any event, the Navy had a "rational basis" in denying parole, Respondent says, because it cited the seriousness of his offense and the need for Helvey to fully serve the retributive and deterrent portion of his sentence. Finally, Respondent asserts that Helvey's other constitutional claims lack merit because he has not identified any similarly situated prisoners who were granted parole, and the denial of parole from an otherwise valid sentence does not violate the Eighth Amendment.

The Court clarifies one issue it believes is not implicated here. In his petition, Helvey expounds on what he believes was an improper influence campaign on the Parole Commission by members of the LGBTQ community in 2022. After thoroughly reviewing the petition, the Court believes this issue is not related to any of Helvey's legal claims. Rather, the petition appears to focus on the NC&PB's 2024 decision denying his parole

---

[8] Congress repeatedly has reauthorized the Parole Commission. Earlier this year, it extended the Commission's term through January 30, 2031. Consolidated Appropriations Act of 2026, Pub. Law No. 119-75, 140 Stat. 173.

request, and Helvey does not allege that the Navy's parole decisions were the result of any supposed political influence.

* * *

The Court starts with some basic principles. Under 28 U.S.C. § 2241(c)(3), a court may grant habeas relief to a person who "is in custody in violation of the Constitution or laws or treaties of the United States." Respondent does not argue that § 2241 is inapplicable here or that this Court lacks the authority to grant relief under that statute to military offenders in the physical custody of the BOP, focusing instead on the merits of Helvey's claims.[9]

## I. *Statutory Claim*

Helvey first argues that authority for adjudicating his parole requests should remain with the Parole Commission rather than the Navy because he is in BOP custody. Evaluating this argument requires some legal background. The Sentencing Reform Act of 1984 abolished federal parole for offenders who committed crimes after 1987. *See United States v. Haymond*, 588 U.S. 634, 651 (2019). "Today a person sentenced to life in prison serves life in prison, unless clemency or compassionate release intervenes." *Von Kahl v. Segal*, 19 F.4th 987, 989 (7th Cir. 2021). However, offenders subject to the prior system can be released far sooner. "[A] person sentenced to 'life' under older law was eligible for parole in ten years, § 4205(a) — sooner if the judgment so provided under

---

[9] Courts regularly have assumed that such review is proper. *See, e.g., Brown v. Sproul*, No. 22-1218, 2022 WL 13909002, at *2 (S.D. Ill. Oct. 24, 2022); *Reliford v. Bell*, No. 17-562, 2019 WL 429293, at *3 (S.D. Ind. Feb. 1, 2019).

§ 4205(b)(2) — and is presumptively entitled to parole after thirty, § 4206(d)." *Id.* As discussed above, a prisoner is eligible for parole under § 4206(d) so long as the Commission does not find the individual has "seriously or frequently violated institution rules and regulations or that there is a reasonable probability that he will commit any Federal, State, or local crime." 18 U.S.C. § 4206(d).

Congress also authorized a system of parole for offenders convicted under the UCMJ. *See* 10 U.S.C. § 952(a) ("The Secretary concerned may provide a system of parole for offenders who are confined in military correctional facilities and who were at the time of commission of their offenses subject to the authority of that Secretary."). "The authority to grant clemency or parole is *highly discretionary* and is vested in the Service Secretaries . . . who are required to establish Clemency and Parole Boards to assist in executing that authority." *Brown v. Johnston*, No. 21-3010, 2021 WL 4206330, at *12 (D. Kan. Sept. 16, 2021) (emphasis added); *see also United States v. Thomas*, 60 M.J. 521, 531 (N-M. Ct. Crim. App. 2004). The Department of Defense (DOD) has directed each military correctional facility (MCF) to set up a "disposition board" to make recommendations for a prisoner's release on parole. DoDI 1325.07 at 5.6(b)(2) (eff. June 6, 2025). With respect to military prisoners transferred to BOP facilities, current policy directs the Commandant of the U.S. Disciplinary Barracks to coordinate with the BOP for input about the case. *Id.* The Commandant will then make clemency and parole recommendations to the Military Department Clemency and Parole Boards. *Id.* By regulation, the NC&PB considers a variety of factors, including the nature and circumstances of the offense, the risk to public safety posed by the defendant, the defendant's record in confinement, the impact of the

Page 9 of 29

offense on the victim, and "Good order and discipline within the Service." SECNAV M-5815.1 at pp. 53-54 (eff. March 2, 2020).

For many years, the Parole Commission handled parole decisions for military prisoners, and it was generally accepted that these prisoners would be subject to the Commission's criteria, even as those criteria were no longer applicable to most civilian prisoners. *See* After the Gavel Falls: An Introduction to the Department of Defense Clemency and Parole Process, 27 Fed. Sent. R. 173, 177 n.4 ("Those military members serving their sentences to confinement at the Federal Bureau of Prisons are not eligible for parole through service clemency and parole boards."); U.S. Parole Commission Manual 2.2-03 (June 30, 2010) ("Prisoners sentenced by military courts-martial and then transferred to a federal institution come under the exclusive jurisdiction of the United States Parole Commission for parole purposes."). This understanding was shared by many courts. *See Garraway v. Tracey*, No. 15-2163, 2016 WL 9234112, at *4 (D. Ariz. Oct. 12, 2016); *Ramirezempuno v. United States Parole Comm'n*, No. 17-5792, 2018 WL 2859382, at *3 (D.N.J. June 11, 2018) (collecting cases); *see also Schick v. Reed*, 419 U.S. 256, 270 n. 3 (1974) (Marshall, J., dissenting) ("Military prisoners incarcerated in federal penitentiaries are governed by the same parole statutes and regulations applicable to all federal prisoners."). And it was reflected in a 1994 Memorandum of Agreement ("Memorandum") between the BOP and the military, which stated that "Parole approval for military prisoners in custody of the FBOP rests with the U.S. Parole Commission."

(Doc. 20-6, p. 3).[10] Generally, courts believed this practice emanated from the second sentence of § 858(a), which provides that military prisoners confined in civilian institutions "are subject to the same discipline and treatment as persons confined or committed by the courts of the United States." *See Hirsch v. Sec'y of Army*, 172 F.3d 878 (10th Cir. 1999) (table) (citing *Stewart v. United States Board of Parole,* 285 F.2d 421, 421-22 (10th Cir. 1960)); *Artis v. U.S. Dep't of Just.*, 166 F. Supp. 2d 126, 130 (D.N.J. 2001); *Barnes v. United States Parole Comm'n*, No. 21-10080, 2021 WL 11505582, at *2 (D. Mass. Aug. 27, 2021); *Holt v. Terris*, 269 F. Supp. 3d 788, 794 (E.D. Mich. 2017), *aff'd,* No. 17-2203, 2018 WL 4908166 (6th Cir. May 22, 2018); *Johnson v. O'Brien*, No. 09-00504, 2010 WL 2927976, at *3 (W.D. Va. July 23, 2010).

Pursuant to a February 22, 2022 Memorandum of Agreement between the Department of the Army[11] and BOP, each service branch's Clemency and Parole Board has assumed authority over parole decisions for military offenders in civilian custody from the Parole Commission. (Doc. 20-5, pp. 2-3). In a reflection of this shift, the Guide to Judiciary Policy states, "On May 30, 2022, the clemency and parole boards assumed authority for supervised release for all military prisoners in FBOP custody. All parole, release, and revocation decisions for military prisoners previously transferred to FBOP reverted to the authority of the clemency and parole board for the individual's branch of

---

[10] The memorandum goes on to state that "[i]n the absence of the U.S. Parole Commission, the Secretaries of the Services will assume parole approval authority." (Doc. 20-6, p. 3).

[11] The U.S. Disciplinary Barracks at Fort Leavenworth, Kansas — where Helvey was in custody prior to his transfer to FCI Greenville — is under the authority of the Department of the Army and is the only maximum-security facility managed by the Department of Defense. *See* Army Corrections Command – U.S. Army Fort Leavenworth, https://home.army.mil/leavenworth/units-tenants/army-corrections-command (last visited April 8, 2026).

service." Guide to Judiciary Policy, Vol. 8E, Ch. 2, p. 2, available at https://www.uscourts.gov/administration-policies/judiciary-policies/post-conviction-supervision-policies (last visited April 13, 2026).

Helvey contends that the 2022 Memorandum is unlawful under § 858(a), so only the Parole Commission — not the Navy — may assess him for parole while he remains in BOP custody.

The Court construes this aspect of Helvey's petition to focus on the identity of the proper decisionmaker for his 2024 parole application. Otherwise, he would have to bring the claim under the Administrative Procedure Act rather than a habeas petition. *See Richmond v. Scibana*, 387 F.3d 602, 605 (7th Cir. 2004) (contrasting claims where a prisoner asserts a right to release and claims raising concerns officials may use incorrect procedures in evaluating future parole applications). In any event, the Court disagrees that § 858(a) bars the military from assuming control over Helvey's parole requests.

At this point, it is well-settled that statutory interpretation begins "with the text of the statute to ascertain its plain meaning." *Jackson v. Blitt & Gaines, P.C.*, 833 F.3d 860, 863 (7th Cir. 2016). This involves assessing the "particular statutory language at issue, as well as the language and design of the statute as a whole." *K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 291 (1988). "Words are given "their ordinary and natural meaning" in the absence of a specific statutory definition. *Nielen-Thomas v. Concorde Inv. Servs., LLC*, 914 F.3d 524, 528 (7th Cir. 2019) (quoting *CFTC v. Worth Bullion Grp., Inc.*, 717 F.3d 545, 550 (7th Cir. 2013)). Three portions of § 858(a)'s text merit discussion.

First, the statute does not mention parole. Instead, it says military inmates must receive the same "discipline and treatment" as other federal inmates. For Helvey's position that the Commission must handle his parole requests to be correct, parole must fall within one of these terms. But release on parole cannot be easily understood as part the normal ambit of prison discipline. Nor is it apparent that parole authority necessarily is captured by the word "treatment." Although "treatment" undoubtedly can be read broadly, principles of statutory interpretation counsel a narrower interpretation. *See Dubin v. United States*, 599 U.S. 110, 124 (2023) (describing the interpretive canon of *noscitur a sociis*, "a word is known by the company it keeps." (citation omitted)). Viewed along with its companion (discipline), "treatment" likely refers to things that are part and parcel of the ordinary conditions of prison life rather than any difference in a prisoner's sentence. Congress likely intended to make clear that military prisoners should be afforded similar living accommodations, commissary items, and curricular opportunities (to name several examples) as any other federal inmate — but did not intend to vest the Commission exclusive authority over the parole of military prisoners in civilian custody.

Second, § 858(a) states that a military prisoner's sentence "may be carried into execution by confinement" in another federal or state institution, but it does not explicitly transfer legal custody of the prisoner to that institution. The Fourth Circuit emphasized that point in *United States v. Joshua*, 607 F.3d 379, 389 (4th Cir. 2010). There, the court considered whether a military prisoner housed in a BOP facility was subject to civil commitment as a "sexually dangerous" person under 18 U.S.C. § 4828, which applies to individuals "in the custody of the Bureau of Prisons." 18 U.S.C. § 4248(a). *Id.* at 381. After

concluding that the statute's use of the term "in custody" meant legal custody rather than "physical custody," the court held that the prisoner remained in the legal custody of the armed forces rather than the BOP. *Id.* at 388. Relevant here, the court looked to § 858 to determine whether the prisoner's transfer to the BOP under that provision vested legal custody in the BOP. Holding that it did not, the Fourth Circuit observed that Congress's use of the words "confinement in" rather than "committed to the custody of" were dispositive. *Id.* at 389.

Echoing this understanding, courts have held that § 858(a)'s "condition that military prisoners be treated no differently — either better or worse — than civilian inmates in the same federal prison pertains only to the 'execution' of their sentences." *Evans v. United States*, No. 24-00959, 2025 WL 2624211, at *3 (C.D. Cal. Sept. 5, 2025). This means that § 858(a) does not create jurisdiction for federal courts to consider compassionate release motions brought by military prisoners, which raise questions of legal custody. *Id.*; *Davis v. United States*, 124 F.4th 980, 984 (5th Cir. 2025) ("[T]he authorization of civilian discipline and treatment for military prisoners focuses on how the 'sentence of confinement' may be 'carried into execution.'"). Likewise, military prisoners are not entitled to time credits under the First Step Act. *See Askins v. Commander, Midwest Joint Reg'l Corr. Facility*, No. 25-3237, 2026 WL 279211, at *2 (D. Kan. Feb. 3, 2026) ("The calculation of a military prisoner's sentence is not a matter of the prisoner's 'discipline' or 'treatment' by the BOP, as only the military authorities may calculate that prisoner's sentence . . . .").

The Sixth Circuit has endorsed a similar reading in an unpublished decision. *Lewis v. Joyner*, No. 19-6381, 2020 WL 3053639, at *1 (6th Cir. June 1, 2020). In that case, a former soldier convicted by a general court-martial and sentenced to life with the possibility of parole was transferred to a BOP facility to complete his sentence. *Id.* In 2014, he applied for parole consideration by the United States Parole Commission. Although the Commission initially intended to consider his application, it reversed course after receiving notice from the military that he was not eligible until he had served 20 years of his sentence. The prisoner then filed grievances disputing the BOP's computation, but the BOP rejected them based on a program statement requiring it to accept DOD's sentence computations. He then filed a § 2241 petition, asserting that he was eligible for parole consideration under the Parole Commission's regulations because he was in BOP custody. The district court denied the petition for two reasons. It rejected the prisoner's claim that failing to apply 18 U.S.C. § 4205 — the Commission's approach — to calculate his eligibility date discriminated against military prisoners because ordinary prisoners are no longer entitled to parole at all. The district court also noted that it was reasonable for the BOP to defer to the DOD's computation of the prisoner's sentence because he had been sentenced by a military court.

The Sixth Circuit affirmed, principally on the ground that the BOP program statement deferring to DOD's sentence computations was a plausible interpretation of its responsibilities under § 858(a). Relying on the Fourth Circuit's decision in *Joshua*, the court agreed that military officials retained legal custody over the prisoner and thus had the "ultimate authority over his detention." *Id.* at *2 (quoting *Joshua*, 607 F.3d at 389).

Because the computation of an inmate's sentence is central to the military's role as legal custodian, the court held the BOP's deference to be a plausible reading of § 858(a). The court also observed that § 858(a)'s "requirement that military inmates in the BOP be given the same treatment as other federal inmates" would be satisfied here because he retained parole eligibility under military regulations while most other inmates would not because of its abolition by the Sentencing Reform Act. *Id.* at *3. Because § 858(a) does not transfer legal custody over Helvey to the BOP, the ultimate authority over his parole from custody must rest with the military.

A related and final piece of evidence in favor of a narrower understanding of § 858(a) comes from its first clause, which clarifies that sentences of military prisoners "carried into execution by confinement" in a non-military facility shall be "*[u]nder such instructions* as the Secretary concerned may prescribe." 10 U.S.C. § 858(a) (emphasis added). Thus, the authority for the Commission's role up to 2022 in managing parole reviews for military prisoners flowed from the statute itself as "instructions" "prescribe[d]" by DOD, which, again, maintains legal custody over such prisoners. *See Joshua*, 607 F.3d at 389.[12]

To be sure, many courts have embraced a more capacious interpretation, finding that § 858(a) mandates military prisoners receive consideration by the Commission. For example, the Tenth Circuit repeatedly has affirmed an interpretation of § 858(a) that a

---

[12] Helvey pushes back that *Joshua* is inapplicable because parole is a question of physical rather than legal jurisdiction. (Doc. 28, p. 2). But release on parole implies that some authority with legal custody (or properly delegated authority from the legal custodian) is making a decision about the parolee's status.

military prisoner "committed to the service of his sentence in a federal penitentiary automatically becomes entitled to any advantages and subject to any disadvantages which accrue to the civilian prisoner." *Hirsch*, 172 F.3d at *1 (quoting *Stewart,* 285 F.2d at 421-22). And in an unpublished opinion, it stated that section 858(a) "reflects Congress' intent that . . . military prisoners . . . who have been transferred to federal custody be subject to the federal laws and regulations governing any other federal prisoner, *including federal parole provisions.*" *Roberts v. United States Dept. of the Navy,* No. 91-6326, 1992 WL 75205 at *4 (10th Cir. 1992) (emphasis added). The Fifth Circuit and D.C. Circuit have held similarly. *See Bates v. Wilkinson*, 267 F.2d 779, 780 (5th Cir. 1959) ("It has long been established that military prisoners may properly be confined in federal institutions and when so confined are subject to all laws pertaining to federal prisoners to the same extent as though the conviction had been by civil court, even though the system of parole and the computation of credits for 'good conduct time' are harsher or different for prisoners confined in disciplinary barracks."); *Koyce v. United States Board of Parole,* 306 F.2d 759, 762 (D.C. Cir. 1962). It should be noted, however, that these cases generally do not feature detailed analysis of how their holdings are supported by § 858(a)'s text. Moreover, they frequently present in situations where a military offender confined in the BOP seeks the benefit of more favorable parole procedures potentially available if they were confined in a military setting. At most, the cases interpreting § 858(a) as Helvey suggests are concerned with the frequency and administrative procedures attendant to parole review while in civilian custody. *See Ruiz v. United States*, No. 23-48, 2025 WL 973935, at *6 (E.D. Tex. Jan. 27, 2025).

Page 17 of 29

On a practical level, if the logic of these cases is that § 858(a) embodies a principle of "equal treatment" between military and civilian prisoners, one questions its continued vitality given the dwindling numbers of federal prisoners eligible for parole consideration. If such an equal treatment principle were taken seriously, § 858(a) might imply that Helvey should not be entitled to parole consideration at all. *Cf. Lewis*, 2020 WL 3053639, at *3 (observing that a military offender is treated more favorably than ordinary inmates because he retains eligibility for parole).

For similar reasons, Helvey's argument, based on *Garraway*, 2016 WL 9234112, at *3, that military officials are "no longer authorized by law to provide a system of parole" once a prisoner is transferred to BOP custody is of little moment. In *Garraway*, the court rightly observed that 10 U.S.C. § 952, which authorizes the military to create a parole system for its offenders, applies only to those "confined in military correctional facilities." *Id.* The court took this facet of the statute as evidence against a military offender's claim that he should receive consideration under military parole regulations even though he was in civilian custody. At least one other court has made a similar point. *See Romey v. Vanyur*, 9 F. Supp. 2d 565, 571 n.5 (E.D.N.C. 1998) ("In addition, 10 U.S.C. § 952 provides that the Secretary of Defense may establish a system of parole 'for offenders who are confined in military correctional facilities.' This suggests that the military regulations have no effect beyond military prisons.").

The problem with this view is immediately evident. If Helvey is correct that the military only has the authority under § 952 to administer parole for inmates housed at military facilities, no statute would authorize *his* release on parole. Section 858(a)'s

Page 18 of 29

"subject to the same discipline and treatment" language could not fill that gap, for civilian inmates, since 1987, are not entitled to parole.

The upshot of the Court's construction of § 858(a) is that Helvey's transfer to a civilian prison did not divest the military from asserting authority as legal custodian over the remainder of his sentence. Therefore, the Court rejects Helvey's assertion that the Parole Commission should have adjudicated his case; the Navy was entitled to do so.

The district court's decision in *DeLaCruz v. Curtis*, No. 24-3030, 2025 WL 238869, at *1 (D. Kan. Jan. 17, 2025), represents a similar conclusion. There, a military prisoner sought a writ of habeas corpus under § 2241 to challenge the military's revocation of his parole. The petitioner had been confined in a civilian prison and released on parole by the Parole Commission in 2022. Shortly thereafter, the Commission reported several parole violations, and the petitioner was arrested and returned to military custody. After the Army's Clemency and Parole Board revoked his parole, he asserted the military had no authority to do so because it had previously transferred custody to the BOP. The court rejected that argument, observing that under 10 U.S.C. § 802(a)(7), individuals serving a sentence imposed by a court martial are subject to military jurisdiction. Although the petitioner had been transferred to BOP custody pursuant to the 1994 Memorandum, that document "did not state that the military, by transferring prisoners to BOP custody, lost all jurisdiction over those prisoners" or "that the transfer of primary parole or revocation authority to the USPC and BOP could not be undone." *Id.* at *1-2.

So too here. *DeLaCruz* illustrates the oddities that would flow from Helvey's interpretation. He does not cite any statute, case, or regulation holding that his transfer

to the BOP is irrevocable. That is, nothing prevents military officials from requiring him to serve the remainder of his sentence in a military correctional facility, where he undoubtedly *would* be subject to the Navy's parole authority. His position that residence in the BOP precludes the Navy from deciding his parole strikes the Court as unduly formalistic.

But more than *who* is adjudicating his parole, Helvey is concerned by *how* they are making the assessment. Helvey submits that if the Navy's review were conducted pursuant to the criteria set out in § 4206(d), he would be entitled to release. He argues that the Navy's decision to apply its own parole criteria instead of § 4206(d) is arbitrary and capricious and violates his constitutional right to due process.

The Seventh Circuit has recognized a form of judicial review in habeas corpus over decisions by the Parole Commission. *See Walrath v. Getty*, 71 F.3d 679, 684 (7th Cir. 1995). But the scope of this review is quite limited. "Since Congress has delegated sole discretionary authority to grant or deny parole to the Commission, absent a procedural or legal error, judicial review of Parole Commission action is limited to determining whether the Commission action was arbitrary or capricious." *Pulver v. Brennan*, 912 F.2d 894, 896 (7th Cir. 1990). "Thus, when a district court reviews a decision of the Parole Commission on a habeas corpus petition, 'the inquiry is not whether the Board is supported by the preponderance of the evidence, or even by substantial evidence; the inquiry is only whether there is a rational basis in the record for the Board's conclusions embodied in its statement of reasons.'" *Hanahan v. Luther*, 693 F.2d 629, 632 (7th Cir. 1982) (quoting *Zannino v. Arnold,* 531 F.2d 687, 691 (3d Cir. 1976)). This deferential standard

carries over to decisions rendered by military parole boards. *See Williams v. Commandant, United States Disciplinary Barracks*, No. 20-3273, 2021 WL 212295, at *3 (D. Kan. Jan. 21, 2021).[13]

Respondent suggests that the Court can avoid the question of whether the Navy *should* have applied § 4206(d) by affirming that its statement of reasons was sufficient to pass muster under that deferential standard of review. (Doc. 20, pp. 12-13). However, the Navy's denial does not even mention in passing either of the § 4206(d) criteria for denying parole (Doc. 1-3, p. 63), so the Court does not see how it could be adequate in the event Helvey was entitled to review under that standard.

In any case, the Court concludes that the Navy's choice to apply its own criteria was neither arbitrary nor capricious. The factors outlined in the Navy's policies are applicable to any other offender in its custody. And requiring the Navy to employ § 4206(d) — a civilian standard — would be wholly foreign to its purposes. The only argument Helvey advances is that § 858(a) requires he be assessed under the criteria the Parole Commission would use in his case, § 4206(d). But as the Court explained above, § 858(a) does not require that result.

## II. *Due Process Claim*

Helvey also asserts that the Navy's refusal to use § 4206(d) in evaluating his parole request violates his right to due process under the Fifth Amendment. A prisoner "may not be deprived of life, liberty, or property without due process of law." *Wolff v.*

---

[13] The Court does not read Helvey's petition to seek review of his 2022 denial by the Parole Commission.

*McDonnell*, 418 U.S. 539, 556 (1974). "A procedural due process claim consists of two elements: (i) deprivation by state action of a protected interest in life, liberty, or property, and (ii) inadequate state process." *Reed v. Goertz*, 598 U.S. 230, 236 (2023). Here, Helvey submits that he had a protected liberty interest in parole under § 4206(d). He reasons that the statute's use of the phrase "shall be released on parole" creates a protected entitlement under the Supreme Court's guidance in *Greenholtz v. Inmates of the Nebraska Penal & Correctional Complex*, 442 U.S. 1 (1979). In that case, the Court held that a state parole statute that creates an "expectancy of release" triggers due process protections. 442 U.S. at 12; *see also Dufur v. U.S. Parole Comm'n*, 314 F. Supp. 3d 10, 24 (D.D.C. 2018).

The Court need not decide whether § 4206(d) creates any such entitlement because Helvey has not established a right to consideration under that statute. As discussed previously, Helvey was sentenced under the UCMJ, which affords the Secretary of Defense substantial discretion in administering parole. *See Brown*, 2021 WL 4206330, at *12. Helvey's transfer to a civilian prison did not divest the military of its authority to manage his sentence and release on parole.

### III. *Equal Protection*

Helvey also claims that his right to equal protection has been violated because "[m]any military offenders" in BOP custody have been granted parole under § 4206(d).[14] It is a fundament of American law "that all persons similarly situated should be treated

---

[14] Helvey cites the Fourteenth Amendment's Equal Protection clause, but that amendment applies only to the states and therefore is not applicable here. *S.F. Arts & Athletics, Inc. v. U.S. Olympic Comm.*, 483 U.S. 522, 542 n. 21 (1987). This problem is of no consequence because the Fifth Amendment "contains an equal protection component," which is assessed under the same standards as claims under the Fourteenth Amendment. *Id.*

alike." *United States v. Nagel*, 559 F.3d 756, 760 (7th Cir. 2009). Helvey's claim does not implicate a fundamental right or a suspect classification, so the Government need only cite a rational basis for the difference in treatment. *Ostrowski v. Lake Cnty.*, 33 F.4th 960, 966 (7th Cir. 2022). The Court reads Helvey's petition to assert a "class-of-one" claim. The Seventh Circuit has explained that equal protection "has also come to be understood to protect individuals against purely arbitrary government classifications." *Geinosky v. City of Chicago*, 675 F.3d 743, 747 (7th Cir. 2012). An individual who believes themselves to be the target of an arbitrary government classification, i.e., a "class-of-one," must establish that he or she was "intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Id.*

Helvey's claim fails for failing to show the existence of similarly situated individuals treated differently. Although Helvey states that he "knows firsthand" many military offenders that have been granted parole (Doc. 1, p. 39), he does not specifically allege the existence of any *military* prisoners in BOP custody whose parole decisions still are made by the Parole Commission under the § 4206(d) criteria. Even if his claim were conceptualized as focusing on the difference in treatment among inmates who became eligible for parole while in civilian custody before the 2022 Memorandum from those who became eligible after the memorandum, he has not alleged that the shift in procedures lacked a rational basis. If anything, the change *addresses* a potential disparity in treatment between military offenders confined in BOP facilities versus those in military facilities, who were apparently previously evaluated under different criteria and were *not* eligible for so-called mandatory parole. *Accord King v. Fed. Bureau of Prisons*, 406 F. Supp. 36, 39

(E.D. Ill. 1976) (holding that a military prisoner confined in a BOP facility had established an equal protection violation where his parole eligibility date was calculated differently than other federal prisoners).

### IV. *Eighth Amendment*

Finally, Helvey claims that the denial of parole violates the Eighth Amendment. The Eighth Amendment forbids "cruel and unusual punishments." U.S. Const. amdt. VIII. "[A] state officer who unlawfully keeps a person in custody beyond the date at which he . . . is entitled to be released imposes a form of cruel and unusual punishment . . . ." *Hankins v. Lowe*, 786 F.3d 603, 605 (7th Cir. 2015). Here, Helvey is serving a life sentence, so Respondent is not keeping him in custody beyond the end of his sentence. Helvey argues that he was entitled to mandatory parole under § 4206(d), so his continued incarceration is unlawful. As the Court concluded above, however, Helvey is properly subject to the Navy's standards, which vest significant discretion with its Clemency and Parole Board. Under such circumstances, the denial of parole is not cruel and unusual punishment. *Lustgarden v. Gunter*, 966 F.2d 552, 555 (10th Cir. 1992) ("Denial of parole under a statute dictating discretion in parole determination does not constitute cruel and unusual punishment.").

To the extent Helvey's argument is that he was entitled to release in 2022, when he was initially assessed by the Parole Commission under § 4206(d) (before the 2022 Memorandum shifted authority to the Navy), that claim also lacks merit. Section 4206(d) "creates a rebuttable presumption favoring release on parole, subject to the Commission's determination as to the statutory factors precluding parole." *Bruscino v. True*, 708 F. App'x

Page 24 of 29

930, 935 (10th Cir. 2017). The statute "make[s] clear that release on parole is still conditional on the Parole Commission finding (1) that the prisoner has not seriously or frequently violated his facility's rules and regulations and (2) that the prisoner is unlikely to commit a crime upon release." *Holt v. Terris*, 269 F. Supp. 3d 788, 791 (E.D. Mich. 2017), *aff'd*, No. 17-2203, 2018 WL 4908166 (6th Cir. May 22, 2018). Accordingly, courts have explained that the "mandatory" label often ascribed to that provision is a misnomer. *See Dufur*, 314 F. Supp. 3d at 19.

So, at a minimum, Helvey would have to show that the Parole Commission's decision did not satisfy the highly deferential standard of review afforded to its decisions, discussed above. *See Walrath*, 71 F.3d at 684. Here, the Commission acknowledged Helvey's lack of disciplinary infractions, which otherwise might have disqualified him from parole under the statute. (Doc. 1-3, p. 26). Nevertheless, the Commission found "case specific factors" creating a "reasonable probability" that he would recidivate if released. (*Id.*). In reaching that decision, the Commission considered the "highly aggravated nature of [his] offense conduct, [his] lack of remorse." And "evidence to conclude [his] actions were motivated by [his] hatred toward homosexuals." (*Id.*). The Commission described how, during initial questioning after the offense, Helvey told an investigator that he would "do it again," "didn't regret it," and that the victim "deserve[d] it." (*Id.*). The Commission further explained that although Helvey denied during the parole hearing that his actions were motivated by homophobia, evidence contemporaneous with the crime reflects otherwise, including an admission to investigators that he hated "faggots" and his signed stipulation that the attack was the

Page 25 of 29

result of his "fear of and disgust for homosexuals." (*Id.*). It concluded that these facts, coupled with Helvey's "new statements at this hearing," were evidence of his "lack of remorse and [] bias toward homosexuals," all of which created a "reasonable probability" he would "commit a future crime if released at this time." (*Id.* at pp. 26-27).

It is not altogether clear what "new statements" at the hearing the Commission considered, and Helvey has not provided a transcript, but it is probable the Commission was referring to Helvey's denial "at this hearing that [his] actions were motivated by a hatred of homosexuals." (*Id.* at p. 26). According to the Hearing Examiner's report, "[a] large concern [was] the inconsistency between his statements today and statements on the record from shortly after the offense that he felt the victim deserved it and that he would do it again." (*Id.* at p. 3). Apparently, Helvey told the Commission that he had "[a]greed with everything in the pretrial agreement to just get things over with" and "did not consider the impact of agreeing to the statements." (*Id.*). Helvey said that he was "just trying to be honest now, and in the past he was also trying to do what he though was best by just agreeing to everything and getting the case over with." (*Id.*). The examiner found this explanation "plausible" and noted that it was difficult to see what advantage Helvey would get from "changing his story," adding that "[e]ven if the contemperaneous [sic] statements were accurate, without any further violent acts or even words in the 30 years since, it is hard to see how that impacts his likelihood of reoffending today. No one argues that he was a danger to the community 30 years ago." (*Id.*).

In his administrative appeal of the Commission's decision, Helvey argued that there was no evidence to support the Commission's finding there was a reasonable

Page 26 of 29

probability he would commit another crime if released on parole. (*Id.* at p. 52). Nevertheless, the National Appeals Board found that the Commission's conclusions were supported by evidence contained in his Helvey's parole file and therefore denied his appeal. (*Id.*).

Helvey again attacks this conclusion; he attached to his petition extensive evidence available to the Parole Commission documenting his conduct while in prison, strong community support, and a reentry plan upon release. (Doc. 1-2). His supporters include several gay or bisexual inmates who attest that Helvey has no ill will towards them or members of the LGBT community. This evidence all speaks well for Helvey. But the problem remains that this Court's review of the Parole Commission's decision is circumscribed. Again, the relevant inquiry "is only whether there is a rational basis in the record for the Commission's conclusions embodied in its statement of reasons." *Slader v. Pitzer*, 107 F.3d 1243, 1246 (7th Cir. 1997) (quoting *Solomon v. Elsea*, 676 F.2d 282, 290 (7th Cir. 1982)).

Here, the Commission apparently was concerned by statements Helvey made during his parole hearing regarding his justifications for his crime, which prompted the Commission to question whether Helvey was truly remorseful and whether, if not, he might reoffend. This Court is not prepared to say that the Commission, which personally assessed Helvey's demeanor, reached an irrational conclusion on that question. *See Wallace v. Christensen*, 802 F.2d 1539, 1551 (9th Cir. 1986) (noting that "the relevance of the information considered by the Commission is a matter committed to discretion"). Nor is the Commission's premise that a lack of remorse creates a probability of

reoffending obviously irrational. That the Commission's decision departed from the hearing examiner's recommendation in favor of parole also is irrelevant. *See Reliford v. Bell*, No. 17-00562, 2019 WL 429293, at *4 (S.D. Ind. Feb. 1, 2019).

Based on the written record alone, Helvey would seem like an impressive candidate for parole under § 4206(d) or the Navy's criteria, but whether this Court agrees with the Commission's decision in this instance ultimately is not relevant. *See Zannino v. Arnold*, 531 F.2d 687, 691 (3d Cir. 1976). Accordingly, Helvey has not established that he was entitled to be released in 2022, and therefore he has not established a violation of his Eighth Amendment right to be free from prolonged detention.

### Conclusion

Helvey has not established that he "is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2241(c)(3). Accordingly, his Petition for a Writ of Habeas Corpus under 28 U.S.C. § 2241 (Doc. 1) is **DISMISSED with prejudice**. The Clerk of the Court is **DIRECTED** to close this case and enter judgment accordingly.

If Helvey wishes to appeal this Order, he must file a notice of appeal with this Court within **60 days** of the entry of judgment. Fed. R. App. P. 4(a)(1)(B). If Helvey chooses to appeal, he will be liable for the $605.00 appellate filing fee irrespective of the outcome of the appeal. *See* Fed. R. App. P. 3(e); 28 U.S.C. § 1915(e)(2); *Ammons v. Gerlinger*, 547 F.3d 724, 725-26 (7th Cir. 2008). If Helvey files a motion for leave to appeal *in forma pauperis*, he must include in his motion a description of the issues he intends to present on appeal. *See* Fed. R. App. P. 24(a)(1)(C).

It is not necessary for Helvey to obtain a certificate of appealability from this disposition of his § 2241 petition. *Walker v. O'Brien*, 216 F.3d 626, 638 (7th Cir. 2000).

**IT IS SO ORDERED.**

**DATED:  April 15, 2026**

_____
**NANCY J. ROSENSTENGEL**
**United States District Judge**